```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION
```

Scott David Staymate,            :

    Plaintiff,                   :

    v.                           :   Case No.  2:15-cv-2744

Carolyn W. Colvin, Acting        :   JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,     Magistrate Judge Kemp

    Defendant.                   :

REPORT AND RECOMMENDATION

I.  Introduction

    Plaintiff, Scott David Staymate, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income.  His current application was filed on January 13, 2010, and alleged that Plaintiff became disabled on July 1, 2005.

    After initial administrative denials of his claim, Plaintiff was given a video hearing before an Administrative Law Judge on April 26, 2012.  In a decision dated June 15, 2012, the ALJ issued a decision denying benefits.

    The Appeals Council, after reviewing the decision, remanded the matter to the ALJ for further proceedings.  A second hearing was held by videoconference before a different ALJ on January 30, 2014.  In a decision dated March 6, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on May 27, 2015, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on September 23, 2015. Plaintiff filed his statement of specific errors on October 21, 2015, to which the Commissioner responded on January 10, 2016.  Plaintiff filed a reply brief on January 25, 2016, and a statement of additional authority on February 1, 2016.  The case is now ready to decide.

II. <u>The Lay Testimony at the Administrative Hearings</u>

Plaintiff, who was born in 1972 and who is a high school graduate with one year of college work, testified as follows. His testimony appears at pages 37-65 and 80-92 of the administrative record.

At the earlier of the two administrative hearings, Plaintiff said he had not worked since 2005. Before that, he had been employed at a gas station for about a year, and then did seasonal work for a carnival. He stopped working and applied for social security benefits due to problems being around people and with his sleep schedule. At the time of that hearing, he was seeing a psychiatrist every three months for both counseling and medication management. Plaintiff acknowledged that he was doing well in his home environment but had not improved much in terms of dealing with the outside world.

Plaintiff also testified about his sleep cycle and his bipolar disorder. He said that at times he would not sleep for days, and at other times he would sleep for two days straight. Any change in circumstances made him anxious. He had some physical problems, including right knee pain. On a typical day, he would watch television, talk to his mother, fix a meal, use the computer, and socialize with a friend or two. He was able to take out the garbage. He suffered from explosive anger disorder which could be brought on by a panic attack. Those did not occur often but they were unpredictable. He had days where he did not leave his room, and he only left his house once or twice per week.

Other problems which Plaintiff experienced included issues with concentration and focus. He could concentrate for up to half an hour or 45 minutes. He tried to avoid people when out in public.

At the second administrative hearing, Plaintiff was asked

again about his work history. In addition to the jobs he mentioned at the first hearing, Plaintiff testified that he had done some stagehand work and worked in the kitchen at a Wendy's restaurant. He also had a short-term job taking inventory, and he had worked for Burger King on two different occasions.

When asked to list his worst medical problem, Plaintiff identified his bipolar disorder. He said he had difficulty remembering details and times and dates, but that had improved with note-taking. He was still seeing a psychiatrist every three months and was also seeing a counselor every other week. Plaintiff thought he could stand for ten or fifteen minutes at a time, could use his hands and arms normally, was able to use a computer, and could lift twenty to thirty pounds. Sitting was not a problem. His sleep varied with his bipolar symptoms.

On a typical day, Plaintiff fixed his own meals, watched television, used the internet, and talked with family members. He no longer visited much with friends. He could go shopping on a slow day and did some household chores. He also said that he had eight to twelve days per month where he was in a manic phase, and about the same number of days when he was depressed. On depressed days, he had more anger issues when dealing with others.

### III. The Medical Records

The medical records in this case are found beginning on page 417 of the administrative record. The pertinent records - those relating to Plaintiff's psychological conditions - can be summarized as follows.

First, notes from Plaintiff's primary physician, Dr. Earley, show that Plaintiff was taking lithium for his bipolar disorder at least as early as 2008. That was prescribed by Dr. Andronic, his psychiatrist, and Dr. Earley did not treat that problem. (Tr. 417-53).

-3-

There are some treatment notes from Dr. Andronic in the file. They generally show improvement in Plaintiff's mood and indicate the lithium was keeping his moods under control, although he was still having some anger issues. A note from early 2010 shows that Plaintiff denied any significant depression or hypomania. (Tr. 501). A subsequent note indicated that Plaintiff had not experienced any panic attacks since being prescribed Depakote. (Tr. 505). When seen again on June 30, 2010, Plaintiff denied having ups and downs, but he did report an occasional episode of being awake for 36 hours. (Tr. 507). Notes from 2013 are similar; for example, on January 24, 2013, Plaintiff reported no depression. (Tr. 579). He was also managing his anger even without Depakote, which he could not tolerate.

David R. Bousquet, a psychologist, performed a consultative evaluation on September 6, 2013. Plaintiff reported that he still had anger issues but they were not as bad as they had been. He also described racing thoughts and depression as well as manic periods which could last for an entire day. He occasionally had visitors but usually passed the day playing games on the internet or watching television. During the evaluation, although Plaintiff's affect was appropriate, his mood was depressed and anxious at times. His cognitive abilities fell in the average range. Mr. Bousquet diagnosed bipolar disorder and rated Plaintiff's GAF at 50 (symptom and overall) and 60 (functional). He concluded that Plaintiff could deal adequately with work instructions, could maintain attention and concentration for simple and multi-step tasks, would have social difficulties in a work setting, and "would be expected to have difficulties with his abilities to respond appropriately to work place stresses and pressures." (Tr. 566-73). Mr. Bousquet also filled out a form on which he indicated that this latter problem was a marked

impairment, based on the fluctuations in energy and motivation which Plaintiff reported, plus his manic episodes. (Tr. 574-76).

Dr. Lewin, a state agency reviewer, completed a mental residual functional capacity evaluation form on March 25, 2010. She found that Plaintiff was able to perform work with no more than minimal contact with the general public and only occasional contact with others. (Tr. 454-57). Dr. Umana affirmed that assessment in her statement of September 19, 2010. (Tr. 516-18). There do not appear to be any more recent state agency evaluations.

### IV. The Vocational Testimony

Vocational testimony was taken at both administrative hearings, but the Court will summarize only the testimony given at the more recent hearing. At that hearing, Linda Dezack was called to testify as a vocational expert. Her testimony begins at page 66 of the administrative record.

Ms. Dezack described Plaintiff's past employment as a gas station attendant or cashier as light and semi-skilled. The job as a fast food worker was unskilled and medium (although Plaintiff performed it at the light level) and the carnival worker, or stage technician, job, was skilled and typically done at the heavy level, although Plaintiff performed it at the medium level.

Ms. Dezack was then asked if someone with Plaintiff's background and who could work at the medium exertional level, but had to avoid concentrated exposure to hazards like moving machinery or unprotected heights, could do any of Plaintiff's past jobs. She testified that the cashier job, kitchen helper job, and stage technician job would all be available.

Next, Ms. Dezack was given some additional limitations to consider, including a limitation on more than occasional contact with supervisors and co-workers and no contact with the general

public. She said such a person could still work as a kitchen helper. The person could also do other medium jobs like auto detailer, commercial cleaner, and laundry worker. Additionally, there were light jobs which such a person could do including solderer, packing line worker, and bottling line attendant. No jobs could be done by someone who was off-task for a minimum of one-third of a workday or who had to miss more than two days of work per month due to psychological symptoms.

   V. <u>The Administrative Law Judge's Decision</u>

  The Administrative Law Judge's decision appears at pages 11-22 of the administrative record. The important findings in that decision are as follows.

  The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since his application date of January 13, 2010. Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including bilateral osteoarthritis of the knees, status post ACL repair of the right knee, obesity, bipolar disorder, passive aggressive personality, generalized anxiety disorder, and personality disorder. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

  Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform light work. He could occasionally climb and kneel and had to avoid unprotected heights and hazardous machinery. From a psychological standpoint, he could have only occasional interaction with supervisors and co-workers, and no contact with the general public. His work should involve working with things as opposed to people. With these restrictions, the ALJ concluded that although Plaintiff could not perform his past relevant work,

Plaintiff could perform the light jobs identified by the vocational expert, including solderer, packing line worker, and bottling line attendant, and that these jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises these issues: (1) the ALJ erred in the weight assigned to certain portions of the opinion of the consultative examiner, Mr. Bousquet; (2) the ALJ failed to develop the record; (3) the ALJ's finding of improvement is not supported by substantial evidence; (4) the ALJ's analysis of the Listing of Impairments was insufficient; (5) there is a conflict between the vocational testimony and the Dictionary of Occupational Titles; and (6) the ALJ improperly shifted the burden of proof to Plaintiff at the fifth step of the analysis. These issues are evaluated under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is

supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A. Mr. Bousquet's Opinion

The ALJ began his analysis of Plaintiff's residual functional capacity by finding him not fully credible based on the activities of daily living that he reported to the Social Security Administration (taking care of personal needs, preparing meals, mowing the lawn, shoveling snow, socializing, shopping, playing games, driving, and watching television) and to Mr. Bousquet (browsing the internet, using Facebook, playing games on the internet, visiting, and doing some household chores). He noted that Plaintiff also told Dr. Andronic that he exercised and enjoyed being outdoors. These, the ALJ said, were activities inconsistent with a debilitating mental condition.

The ALJ next recounted Plaintiff's treatment history, pointing out that various notes showed Plaintiff as doing well, and that he had no mental health treatment at all in 2012. Those records also showed that Plaintiff was "stable on medication, controlling his anger, and doing well." (Tr. 19).

Against this backdrop, the ALJ considered Mr. Bousquet's opinion. He recited Mr. Bousquet's observations during the evaluation and both the diagnoses and GAF scores. He then concluded that Plaintiff had the mental residual functional capacity attributed to him in the ALJ's own finding on this

issue, stating that he found no evidence of more severe limitations in the areas of activities of daily living, social functioning, or concentration, persistence, and pace in Mr. Bousquet's report.  Finally, he gave great weight to both the state agency physicians' opinions and to Mr. Bousquet's opinion, except that less weight was given to the one marked limitation identified by Mr. Bousquet, noting that it was "based on the claimant's subjective reporting of his symptoms and not supported by other objective evidence" and also not consistent with the functional GAF score of 60, "which supports only mild limitation in functioning."  (Tr. 20).

It is difficult to determine exactly what deficiencies Plaintiff attributes to this line of reasoning.  He appears to claim that the expertise of the consultative examiner in the requirements of the Social Security Disability Program was disregarded by the ALJ, as were portions of other records and testimony which could be interpreted to be consistent with Mr. Bousquet's findings.  The Commissioner responds that the ALJ's credibility finding is not at issue here and supports his discounting of Mr. Bousquet's finding as to Plaintiff's ability to deal with workplace stress, since that finding was based on Plaintiff's self-report of specific symptoms, and also that the functional GAF score of 60 is an indication of only mild symptoms in areas like that.

The Court of Appeals has explained what the reviewing court's obligations are when considering if an ALJ has adequately evaluated an opinion from a non-treating source.  Such opinions are not, of course, entitled to controlling weight - that is reserved for certain treating source opinions - but the ALJ still "must weigh medical opinions based on the nature of the treatment relationship, the specialization of the medical source, and the consistency and supportability of the opinions."  Porter v. Comm'r of Social Security, No. 15-1530 (6th Cir. March 31, 2016),

slip op. at 2-3, citing <u>Gayheart v. Comm'r of Social Security</u>, 710 F.3d 365, 376 (6th Cir. 2013).

Here, Mr. Bousquet was not a treating source and had no long-standing relationship with Plaintiff. Although he is a specialist in mental health issues, and such specialists rely to a great extent on the symptoms which a patient reports, he explicitly supported his finding of a marked limitation in the ability to deal with work stress with a reference to Plaintiff's self-report rather than any objective findings or observations or on any comprehensive review of prior treatment records. Essentially, he made a credibility finding which is at odds with that of the ALJ. The functional GAF of 60 is also, as the ALJ correctly noted, indicative of only mild symptoms in functional areas, and dealing with work stress is one of those areas. The ALJ clearly relied on various reports of activities of daily living as well and on comments in Dr. Andronic's treatment notes, and his citations to those comments are accurate and supported by the record. Certainly, there is also evidence which is consistent with Mr. Bousquet's evaluation, but that is not the controlling legal test. See <u>Buxton v. Halter</u>, 246 F.3d 762, 772 (6th Cir. 2001)("[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion"). The Court finds no error in the ALJ's evaluation of Dr. Bousquet's opinion.

### B. <u>Listing 12.04</u>

The Court turns next to Plaintiff's argument that the ALJ should have found that his impairment satisfied section 12.04 of the Listing of Impairments, since that argument also relates to Plaintiff's psychological ability to perform work-related functions. The ALJ noted that there were no opinions in the record which supported a finding that Plaintiff had the degree of limitation required in the four areas addressed by the "B"

criteria of this Listing (which are activities of daily living, social functioning, concentration, persistence, and pace, and decompensation in work or work-like settings) and that because he did not have either two marked limitations in the first three areas, or one marked limitation coupled with repeated episodes of decompensation, he did not satisfy those criteria.  The ALJ also found that the "C" criteria - one of which is the presence of "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" - were not satisfied.  It is this finding which Plaintiff attacks, asserting that the ALJ did not give adequate attention to the issue of decompensation given Plaintiff's frequent changes in medication.

The Commissioner's memorandum does not directly address this contention.  However, there is nothing in the record suggesting either that even a minimal increase in mental demands would cause Plaintiff to decompensate, or that his medication changes were indicative of frequent decompensation or a risk that such decompensation would occur.  The closest the record comes to supporting such a finding is Mr. Bousquet's conclusion about how Plaintiff would react to workplace stress, but the Court has already sustained the ALJ's decision not to give great weight to that finding.  Like the situation described in Frampton v. Colvin, 2014 WL 5307885 (N.D. Ohio Oct. 16, 2014), the record simply does not compel a finding that the type of decompensation described in the "C" criteria - including loss of adaptive functioning in other areas like activity of daily living and social functioning, see id. at *7 - would result from placing Plaintiff under an increase in mental demands.  The ALJ's decision on this issue is sufficiently thorough and supported by substantial evidence to preclude the Court from reversing it.

C.  Vocational Issues

In his final two claims of error, Plaintiff argues that the vocational expert's testimony was, to some extent, in conflict with the DOT even though the vocational expert said it was consistent, and that the ALJ erred by placing an improper burden on Plaintiff to come forward with evidence at the fifth stage of the sequential evaluation process. This latter contention is simply not borne out by the record. The ALJ recognized that it is the Social Security Administration's duty to provide evidence, at this step, "that demonstrates that other work exists in significant numbers in the national economy that the claimant can do ...." (Tr. 13). The ALJ did not make any decisions at the fifth step which reflected an alleged failure on the part of Plaintiff to produce contrary evidence. As to the former contention, even if some conflict exists which would bring into question whether Plaintiff could perform two of the three jobs identified by the vocational expert (and the Court is not persuaded that there is an actual conflict here), as the court said in Martin v. Comm'r of Social Security, 170 Fed.Appx. 369, 374 (6th Cir. March 1, 2006), the ALJ was permitted to rely on the expert's testimony since the alleged inconsistencies were not pointed out at the hearing, and the remaining jobs are enough to support a finding that the Plaintiff can perform substantial gainful activity. There is no error here in the ALJ's step five determination.

D. Other Issues

The other issues raised relate to the duty to develop the record and the finding of medical improvement. The Court finds no need to devote substantial discussion to either. Plaintiff was represented by counsel at the hearing and the record was sufficiently well-developed so that a meaningful decision could be made. See Foster v. Halter, 279 F.3d 348, 355 (6th Cir. 2001). Further, the area where the ALJ found medical improvement was not significant to his decision - nor did he, as Plaintiff

appears to argue, make that decision based solely on the passage of time, but rather on the content of additional medical records. Neither of these claims supports reversal.

## VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge